MSHC, INC. d/b/a SERVICE LOGIC,

    Plaintiff,

v.

IVANILDO NORBERTO DA SILVA,

    Defendant.

**VERIFIED COMPLAINT FOR DAMAGES, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTION**

Plaintiff MSHC, Inc. d/b/a Service Logic ("Service Logic"), for its Verified Complaint against Defendant Ivanildo Noberto Da Silva, Jr., alleges as follows:

**PARTIES**

1. Service Logic is a Delaware corporation with its principal place of business and headquarters located in North Carolina.

2. Upon information and belief, Defendant Da Silva is an individual residing in South Carolina.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action involves citizens of different states and the amount in controversy exceeds $75,000.

4. This Court has personal jurisdiction over Defendant Da Silva because he works from, operates, and owns a business located in North Carolina, and caused harm to Service Logic in North Carolina.

5. This Court is the proper venue because a substantial part of the events or omissions

giving rise to the claims occurred in District and Division, including Defendant Da Silva's employment with Service Logic, his unfair competition against Service Logic, and his breach of his contractual obligations.

**BACKGROUND**

**Defendant Da Silva's Employment with Service Logic**

6. Service Logic is a commercial heating, ventilation, and air conditioning ("HVAC") installation and maintenance company with locations across the United States and Canada. Service Logic employs over 5,000 technicians across approximately 155 locations.

7. On December 12, 2023, Service Logic hired Defendant Da Silva as the Director of Operational Accounting at Service Logic's headquarters in Charlotte, North Carolina.

8. On that same day, Da Silva signed an offer letter describing the terms of his offer of employment. A true and accurate copy of this offer letter is attached hereto as **Exhibit 1**.

9. In exchange for his services, Da Silva was paid an annual salary of $225,000 with a target annual bonus to earn an additional $67,500. (Ex. 1 at 1.)

10. Da Silva was also paid a signing bonus of $50,000 and had the opportunity to earn incentive equity in Service Logic's parent companies. (*Id.*)

11. In his role as the Director of Operational Accounting, Da Silva was tasked with analyzing financial statements and had access to certain of Service Logic's Proprietary Information, including sensitive financial and customer information. (*Id.*)

12. Service Logic's Proprietary Information that Da Silva was granted access to included financial, operational, and customer-related records such as internal financial statements, pricing and margin data, customer lists and contact information, sales training and prospecting materials, and other non-public strategy and training documents maintained on Service Logic's

2

secure servers and "Box" system.

13.     This type of knowledge is not publicly compiled or available in the marketplace; it reflects internal operational experience and institutional knowhow developed over many years.

14.     A competitor in possession of this knowledge could rapidly replicate Service Logic's internal processes, avoid the trial-and-error costs Service Logic incurred to develop them, and gain an unfair competitive advantage in pricing, service delivery, and customer retention.

15.     Service Logic protects its Proprietary Information by storing it on a secure server that requires a password to gain access, by granting employees access to it on a need-to-know basis, and by requiring certain employees with access to execute agreements that include confidentiality and nondisclosure obligations.

16.     On March 24, 2026, Da Silva was promoted to Group Chief Financial Officer, working closely with the Group President to assist on key initiatives and objectives.

17.     As Group Chief Financial Officer, Da Silva continued to have access to Service Logic's Proprietary Information to perform his job duties.

18.     On July 26, 2024, Da Silva agreed to an award agreement ("Award Agreement") wherein he was granted certain Class B Units ("Time Vesting Units") in Service Logic's then-parent company, Saber Parent Holdings LP.

19.     As part of the Award Agreement and in consideration for the granted Class B Units, Da Silva agreed to a Restrictive Covenants agreement ("Restrictive Covenants Agreement"). A true and accurate copy of the Restrictive Covenants Agreement is attached as **Exhibit 2.**

20.     Da Silva agreed that during his employment and for 24 months thereafter, he would "not use for [his] own purpose or for the benefit of any person or entity other than the Company

3

or its partners or affiliates, nor shall the Participant otherwise disclose to any individual or entity at any time while the Participant is employed by the Company or thereafter any Proprietary Information of the Company . . . ." (Ex. 2 ¶ 3.)

21.     The Restrictive Covenants Agreement defines "Proprietary Information" to include, among other things, information "relating to any customer, supplier, contractor, service provider or affiliate of the Company or any information concerning the transactions or relations of any customer, supplier, contractor, service provider, personnel or affiliate of the Company or any of its partners"; information "concerning any product, service, technology, process, methodology, technique, specification, algorithm, formula, know-how or procedure offered or used by the Company, or under development by or being considered for use by the Company"; and information "relating to marketing or pricing plans or methods, capital structure, or any business or strategic plans of the Company, including with respect to market analyses, financial information, product plans and research and development." (*Id.* ¶ 8.)

22.     The Restrictive Covenants Agreement specifically excludes from the definition of "Proprietary Information" "any information that is or becomes generally known to the public other than through actions (directly or indirectly) of the Participant in violation of the restrictive covenants set forth in this Agreement." (*Id.*)

23.     Da Silva also agreed to return, upon termination of his employment, all "correspondence, memoranda, files, manuals, financial, operating or marketing records, magnetic tape, or electronic or other media of any kind which may be in the Participant's possession or under the Participant's control of accessible to the Participant which contain any Proprietary Information." (*Id.* ¶ 4.)

24. At paragraph 6 of the Restrictive Covenants Agreement, Da Silva agreed "that all inventions, innovations, trade secrets, patents and processes in any way relating, directly or indirectly, to the Company's business developed by the Participant alone or in conjunction with others at any time during the Participants employment by the Company ("Inventions") shall belong to the Company." (*Id.* ¶ 6.)

25. Da Silva also agreed that the Restrictive Covenants Agreement's restrictive covenants were "essential for the protection of the trade secrets, confidential business and technological information, customer relationships, and competitive position of the Company; Company; that a breach of any covenant contained in this Agreement would cause the Company irreparable damage for which damages at law would not be an adequate remedy; and that, in addition to damages and other remedies to which the Company would otherwise be entitled, it will be entitled to whatever injunctive relief is appropriate for any such breach." (*Id.* ¶ 9.)

26. On July 8, 2025, Da Silva received the first installment of Time Vesting Units under the Award Agreement.

**Defendant Da Silva Purchases a Competing Company While Employed by Service Logic**

27. On September 19, 2025, while still employed by Service Logic, Da Silva formed Hickory Mechanical HVAC and Plumbing, Inc. ("Hickory Mechanical"). (**Ex. 3**, N.C. Sec'y of State Bus. Search for Hickory Mech.)

28. Da Silva is listed as the Registered Agent, Executive Officer, President, and Secretary of Hickory Mechanical. (*Id.*)

29. Upon information and belief, Da Silva formed Hickory Mechanical in order to purchase the assets of Hickory Mechanical, Inc. ("HMI"), a direct competitor of Service Logic.

30. In or around October 2025, Da Silva, through his newly formed company Hickory

Mechanical, purchased HMI via an Asset Purchase Agreement.

31. While employed by Service Logic, Da Silva built out Hickory Mechanical using Service Logic's resources, time, business model, and information.

32. Under the Asset Purchase Agreement, certain payments were deferred to HMI and its former owner, contingent on Hickory Mechanical meeting certain financial targets.

33. Da Silva did not inform Service Logic that he had purchased HMI or that he was competing against Service Logic, nor did he bring the HMI opportunity to the attention of Service Logic.

34. Instead, Da Silva engaged in the funding and operations of a direct competitor while still employed by Service Logic.

35. Upon information and belief, Da Silva is copying Service Logic's business model to compete against Service Logic and by using Proprietary Information belonging to Service Logic.

### Service Logic Terminates Defendant Da Silva's Employment and He Begins Misappropriating Service Logic's Proprietary Information

36. On or around May 27, 2026, Service Logic became aware of Da Silva's competitive activities.

37. Later that same day, Service Logic placed Da Silva on suspension from employment, effective immediately.

38. On May 27 and June 1, 2026—immediately following his suspension, but prior to his termination—Da Silva accessed and, upon information and belief, downloaded numerous proprietary and confidential training materials from Service Logic's secure servers, including the following:

6



Case 3:26-cv-00517     Document 1     Filed 06/30/26     Page 7 of 12



39.     These materials included confidential details regarding sales techniques and strategies, and product information developed by Service Logic, reflecting a considerable investment of time and resources.

40.     There is no legitimate business reason for Da Silva accessing the documents shown above while on suspension from Service Logic.

41.     Upon information and belief, Defendant Da Silva downloaded these documents

shown above in order to unfairly compete against Service Logic through his new company, Hickory Mechanical.

42. On June 1, 2026, Service Logic terminated Da Silva's employment, for cause.

## COUNT I
### Breach of Contract

43. Service Logic restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

44. The Restrictive Covenants Agreement is an enforceable contract.

45. Da Silva agreed to be bound by the terms of the Restrictive Covenants Agreement.

46. The Restrictive Covenants Agreement is supported by adequate consideration, including Da Silva's continued at-will employment with Service Logic and other good and valuable consideration provided to Da Silva.

47. Da Silva breached the Restrictive Covenants Agreement through his use of Service Logic's Proprietary Information to form Hickory Mechanical and compete against Service Logic.

48. Da Silva breached the Restrictive Covenants Agreement by failing to return to Service Logic its Proprietary Information upon his termination of employment.

49. Da Silva formed Hickory Mechanical and purchased HMI using Service Logic's resources, time, and information while employed by Service Logic, and therefore Hickory Mechanical's ownership of HMI's assets constitutes an "Invention" under the Restrictive Covenants Agreement.

50. Da Silva breached the Restrictive Covenants Agreement by not transferring and/or providing the "Invention" to Service Logic.

51. As a direct and proximate result of Defendant Da Silva's breaches of contract,

9

Service Logic has suffered irreparable harm and is entitled to injunctive relief to prevent further irreparable harm, including Defendant Da Silva's continued possession and use of Service Logic's Proprietary Information.

52.     As a direct and proximate result of Defendant's breaches of contract, Service Logic has also suffered substantial monetary damages that will be established at trial.

**COUNT II**
**Breach of Fiduciary Duties**

53.     Service Logic restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

54.     As a managerial employee of Service Logic, Defendant Da Silva was placed in a relationship of trust and confidence with Service Logic.

55.     Defendant Da Silva therefore had a duty of loyalty to act in the best interests of Service Logic with honesty, loyalty, and due care.

56.     Defendant Da Silva breached those duties by using Service Logic's company resources, time, and Proprietary Information to purchase a competing business and by not bringing the HMI opportunity to the attention of Service Logic.

57.     As a direct and proximate result of Da Silva's breaches of fiduciary duties, Service Logic has suffered irreparable harm and is entitled to injunctive relief to prevent further irreparable harm, including Defendant's continued operation and ownership of a competing business.

58.     As a direct and proximate result of Defendant's breaches of fiduciary duties, Service Logic has also suffered substantial monetary damages that will be established at trial.

59.     Defendant Da Silva's actions were willful and wanton, entitling Service Logic to punitive damages and attorney's fees.

## JURY DEMAND

Plaintiff demands a jury trial on all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, having stated its Verified Complaint against Da Silva, Service Logic respectfully requests that the Court:

a. Enter a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Defendant Da Silva, his agents, and all other persons acting in concert with him from using, sharing, or disclosing Service Logic's Proprietary Information and requiring Defendant Da Silva to immediately return to Service Logic and permanently destroy all such information of Service Logic and certify compliance with the foregoing;

b. Enter a permanent injunction requiring Defendant Da Silva to divest Hickory Mechanical and all assets Hickory Mechanical acquired from HMI;

c. Award Service Logic compensatory damages against Defendant Da Silva in the amount of all actual damages that Service Logic is determined at the trial of this action to have sustained, together with pre-judgment interest;

d. Enter an Order rescinding the award of equity to Defendant Da Silva;

e. Award punitive damages and attorney's fees; and

f. Grant such other and further relief as may be just and proper.

Date: June 30, 2026

Respectfully submitted,

MSHC, INC. d/b/a SERVICE LOGIC

*/s/ Benjamin S. Morrell*

Benjamin S. Morrell (NC Bar No. 56676)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
bmorrell@taftlaw.com

*Counsel for Plaintiff*

## VERIFICATION

Scott Wulinsky, Chief Financial Officer of Plaintiff MSHC, INC. d/b/a Service Logic, being first duly sworn, deposes and says:

I have read the foregoing Verified Complaint and have personal knowledge of the contents thereof; and I verify that the contents of the Verified Complaint are true, except any matters therein alleged upon information and belief, and as to those matters, I believe them to be true.

This the 30th day of June 2026.

_____
Scott Wulinsky

STATE OF North Carolina

COUNTY OF Mecklenburg

Sworn and subscribed before me

This 30th day of June 2026, by Scott Wulinsky

_____
Notary Public

My commission expires: 11/6/2027



Alexandra Dunavant
NOTARY PUBLIC
Mecklenburg County, NC
My Commission Expires November 06, 2027

Case 3:26-cv-00517    Document 1    Filed 06/30/26    Page 12 of 12